IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Estate of Daniel Morris, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:20-cv-50320 |
| v. ) | |
| ) | Honorable Iain D. Johnston |
| ) | |
| Rob Jeffreys, et al. ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Daniel Morris died by suicide on September 13, 2018, less than forty-eight hours after being placed in disciplinary segregation at Dixon Correctional Center (Dixon). Mr. Morris' Estate brought this suit alleging violations of the Eighth and Fourteenth Amendments, 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and *Monell*. Before the Court are two motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Rob Jeffreys, Director of the Illinois Department of Corrections ("IDOC"), brings a motion to dismiss Counts I (§ 1983) and III (ADA and RA) against him. Chad Williamson, a Correctional Officer at Dixon, brings a motion to dismiss Count II (§ 1983) against him. For the reasons below, Williamson's motion to dismiss is denied, and Jeffreys' motion to dismiss is granted.

\* \* \*

As a threshold matter, the Court reviews the claims presented to determine which constitutional rights are allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The parties fail to clearly identify the underlying constitutional violations alleged for Counts I and II, which are both under 42 U.S.C. § 1983. On its face, Count I in the Second Amended Complaint

1

("SAC") alleges that it is "based on violation of the Fourteenth Amendment" and that "Morris had a constitutionally protected right under the Fourteenth Amendment to the U.S. Constitution to receive needed care while IDOC [sic], and to have his mental health issues timely and properly assessed and treated." Dkt. 42, ¶¶ 59-60. And on its face, Count II alleges its basis "on violation of the Eighth Amendment" and Mr. Morris' "constitutionally protected right under the Eighth Amendment to the U.S. Constitution to receive needed care while in the IDOC, and to have his mental health issues timely and properly assessed and treated." *Id.* at ¶¶ 70-71. Both counts identically allege that Defendants:

- "exhibited deliberate and callous indifference to serious psychological and mental health needs," *id.* at ¶¶ 61, 72;

- "intentionally and knowingly failed to provide serious, ongoing case management and treatment for such inmates and failed to regularly monitor their mental health care needs," *id.* at ¶¶ 62, 73; and

- "knew . . . that there was a substantial risk that mentally ill inmates, left substantially untreated, would attempt suicide, that such suicides were reasonably foreseeable, that the threat of this action was imminent and immediate, and that inmates at risk possessed the means to accomplish that end," *id.* at ¶¶ 63, 74.

Were the Estate to allege that Mr. Morris was a civil detainee, a claim under the Fourteenth Amendment, instead of the Eighth Amendment, would make sense. *See, e.g.*, dkt. 42, ¶ 3 (referring to Mr. Morris as an "inmate"), ¶ 4 (referring to Mr. Morris' "incarceration at Dixon"); *Ingraham v. Wright*, 430 U.S. 651, 668 (1977) (finding that the Eighth Amendment protects against cruel and unusual punishment *after* a criminal conviction, not before). Further, were the Estate to allege a due process violation, or facts by which the Court could draw a reasonable inference of such violation, a Fourteenth Amendment claim would be plausible. *Ingraham*, 430 U.S. at 668; *Payne v. Churchich*, 161 F.3d 1030, 1039 (7th. Cir. 1998). However, despite referencing the Fourteenth Amendment in Count I and the Eighth Amendment in Count II, the

Court will construe both counts to be arguing § 1983 claims *under the Eighth Amendment*. *Miranda v. Cty. Of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *see also Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 756 (7th Cir. 1999) (citing wrong legal theory is not a basis for dismissal).

## ANALYSIS

To defeat a motion to dismiss, the plaintiff must have alleged facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This means that a plaintiff's well-pleaded factual allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 622, 678 (2009). The Court accepts as true all of the plaintiff's well-pleaded allegations and views them in the light most favorable to the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019). The burden of persuasion on a motion to dismiss rests with the defendant. *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008) ("On a motion to dismiss, defendants have the burden of demonstrating the legal insufficiency of the complaint – not the plaintiffs or the court."). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 545.

### A.  § 1983 – Deliberate Indifference to Serious Medical Needs

An Eighth Amendment violation exists when prison staff is deliberately indifferent to a serious medical need. *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S.

3

153, 173 (1976)) (cleaned up). Deliberate indifference to serious medical needs can be evidenced by prison staff "intentionally denying or delaying access to medical care or intentionally interfering with [proscribed treatment]." *Estelle*, 429 U.S. at 104-05. However, "an inadvertent failure to provide adequate medical care" is not enough to rise to the level of deliberate indifference. *Id.* at 105. Similarly, a physician's negligence in diagnosing or treating a prisoner's medical condition is not enough. *Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). To state a cognizable claim, a prisoner must allege that acts or omissions by prison staff were sufficiently harmful to "offend evolving standards of decency." *Id.*

   1. *Count I against Jeffreys, as Director of the Illinois Department of Corrections*

In the second amended complaint, the Estate sued Jeffreys in his official capacity for damages under §1983. Dkt. 42, ¶14. But state officials sued in their official capacity are not "persons" under §1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), and official capacity suits for damages against state officials in their official capacity are barred by the Eleventh Amendment, *Quern v. Jordan*, 440 U.S. 332, 342 (1979); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). In its response brief, the Estate recognized these problems and stipulated to dismissal of this claim to be filed in the Illinois Court of Claims. Dkt. 57, 3. Therefore, Jeffreys' Motion to Dismiss is granted as to Count I.

   2. *Count II against Williamson, in his individual capacity*

Although Count II is properly alleged against Williamson in his individual capacity, Williamson moves to dismiss based on his lack of subjective knowledge as to Mr. Morris' risk for suicide. To succeed on a claim for deliberate indifference against Williamson, Williamson must have known or inferred a substantial risk of serious harm and ignored the risk. *Eagan v.*

4

*Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021) (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) ("Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk.")); *see also Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) ("suicide is a serious harm" that satisfies the objective element). The defendant must have been aware that the inmate could imminently take his own life. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000); *see also Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir. 2001) (finding no liability when "the defendants simply were not alerted to the likelihood that [the inmate] was a genuine suicide risk."). "Deliberate indifference requires a showing of 'more than mere or gross negligence, but less than the purposeful or knowing infliction of harm.'" *Collins*, 462 F.3d at 762 (quoting *Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)).

It is also not enough to say that a prison official "failed to address 'a significant risk that he should have perceived of but did not.'" *Steidl v. Gramley*, 151 F.3d 739, 740 (7th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). When the substantial risk is one of suicide, a plaintiff must show that defendant both had subjective knowledge of the inmate's suicide risk *and* intentionally disregarded that risk. *Collins*, 462 F.3d at 761. "A jail or prison official's failure to protect an inmate from self-harm [is] one way of establishing deliberate indifference to a serious medical need." *Miranda v. Cty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) ("The obligation to intervene covers self-destructive behavior up to and including suicide.").

To state a claim for failure to protect, an inmate must allege that he is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. But to succeed on a motion to dismiss, a plaintiff need not allege facts for each element. *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017) ("[I]t is manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each."). Here, Plaintiff has plausibly alleged deliberate indifference on the part of Williamson.

Taking as true all allegations in the Second Amended Complaint, Mr. Morris was on the "mental health caseload," taking psychotropic medications, designated as "Seriously Mentally Ill (SMI)," and assigned to the "Residential Treatment Unit (RTU)." *See, e.g.*, Dkt. 42, ¶¶ 2, 26-28. Throughout his time at Dixon, Mr. Morris was "known by staff and medical personnel to be at risk of suicide and was placed on suicide precautions multiple times." *Id.* at ¶ 4. Although he was supposed to see a psychiatrist every thirty days, because of a backlog at Dixon, he was last seen on July 9, approximately two months before his death, and he did not receive any "intensive psychological and psychiatric services" during that time period. *Id.* at ¶¶ 29-30. While Mr. Morris was in the segregation unit, he spoke to Ahrens, a staff psychologist, about receiving medication and expressed to him that he needed a Crisis Team member because he was planning to kill himself. *Id.* at ¶¶ 35-36. Ahrens "never consulted with the doctor regarding Daniel Morris's request for medication" and "never contacted a Crisis Team member or placed Daniel Morris on a crisis watch." *Id.* Williamson, who "was responsible for the well-being and safety of prisoners at Dixon Correctional Center, including doing cell checks every thirty (30) minutes on prisoners in the segregation unit," only completed one cell check on September 13 and did not conduct his 3:30 AM facility count. *Id.* at ¶¶ 20, 41-43. Williamson discovered Mr. Morris' body at 6:12 A.M.

Williamson moves to dismiss this claim because he had no *subjective* knowledge of the risk to Mr. Morris. In doing so, Williams cites several cases addressing the subjective knowledge element. But every case was decided on a summary judgment motion, with the benefit of a fully developed factual record. Here, the argument is raised on a motion to dismiss, which is an entirely different analysis. Drawing all reasonable inferences in favor of the Estate, it has plausibly stated a claim of deliberate indifference against Williamson. The Estate alleges that Mr. Morris was on the mental health caseload, that he was designated as seriously mentally ill, that he was assigned to the residential treatment unit, that he was on psychotropic medications, that he was known by staff to be at risk of suicide, that he was placed on suicide precautions multiple times, that Williamson was well aware of the fact that there were inmates who suffered from severe mental health needs and were at risk of suicide,[1] that Williamson knew that there was a substantial risk that mentally ill inmates would attempt suicide, that Williamson knew the threat of suicide was imminent and immediate, that inmates at risk of suicide possessed the means to complete it, and that Williamson's response to Mr. Morris' suicide risk was unreasonable because he created the risk when he failed to make mandatory cell checks every thirty-minutes and failed to conduct the 3:30 A.M. facility count. Based on these allegations, the Estate has plausibly alleged a claim. "Suicide is a known risk in the custody setting, and occurs at higher rates than in non-custodial settings." *Lapre v. City of Chicago*, 911 F.3d 424, 430 (7th Cir. 2018). The growing suicide rate in prisons is alarming and the topic of extensive study.[2] Mandatory cell checks are

---

[1] It is unclear whether his awareness is of inmates with mental health needs and of inmates at risk of suicide (as two distinct groups), or whether the awareness of inmates with mental health needs who were at risk of suicide (one group). Because the Court must draw all reasonable inferences in favor of the Plaintiff, the latter is inferred.

[2] *See, e.g.*, U.S. Dep't of Justice, Bureau of Justice Statistics, *Mortality in State and Federal Prisons, 2001-2008 – Statistical Tables*, NCJ 255970 (April 2021), https://bjs.ojp.gov/content/pub/pdf/msfp0118st.pdf; Namkee G. Choi, et al., *Suicide Decedents in Correctional Settings: Mental Health

one way that prisons have tried to reduce that rate. *See Lapre*, 911 F.3d at 435 (discussing the State of Illinois' "Lockup Standards," which require in-person checks every half hour). The Court cannot say at this stage whether Mr. Morris' death could have been prevented if Williamson completed his assigned cell checks—nor can it say whether Williamson's inaction was indeed deliberately indifferent. But the Estate has plausibly alleged that he knew of Mr. Morris' risk of suicide and objectively and unreasonably failed to carry out his assigned duties of checking cells every thirty minutes and completing a 3:30 A.M. count.

For these reasons, Williamson's Motion to Dismiss is denied as to Count II.

## B. Americans with Disabilities Act and Rehabilitation Act

Title II of the Americans with Disabilities Act ("ADA") authorizes suits by private citizens for damages against public entities through abrogation of the Eleventh Amendment.[3] *United States v. Georgia*, 546 U.S. 151, 154 (2006). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." *Id.* at 153 (quoting 42 U.S.C. § 12132). A qualified individual with a disability is a person "who, with or without reasonable modifications to rules, policies, or practices . . . or transportation barriers . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* at 153-54 (quoting 42 U.S.C. § 12131(2)). State prisons, like those within the Illinois Department

---

*Treatment for Suicidal Ideation, Plans, and/or Attempts*, 25.1 J. Correctional Health Care 70 (Jan. 3, 2019), https://doi.org/10.1177/1078345818819500; Anasseril E. Daniel, *Preventing Suicide in Prison: A Collaborative Responsibility of Administrative, Custodial, and Clinical Staff*, 34 J. Am. Acad. Psy. Law 165 (2006), http://jaapl.org/content/jaapl/34/2/165.full.pdf (last accessed Jul. 12, 2021).

[3] The Supreme Court has not resolved whether state sovereign immunity extends to damages for violations of the ADA but not the Fourteenth Amendment. *See Barrett v. Wallace*, 570 F. App'x 598, 601 n.1 (7th Cir. 2014) (finding no obstacle because damages against the state were available under the RA).

of Corrections, are considered public entities under this Act, and "services, programs, or activities" includes medical programs. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998). "Title II's enforcement provision incorporates by reference § 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 749a, which authorizes private citizens to bring suits for money damages. 42 U.S.C. § 12133." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). Thus, the analysis under the Rehabilitation Act ("RA") is "functionally identical," except that instead of protecting against disability discrimination by a public entity, the RA protects against discrimination by a state agency that accepts federal funds. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal citations omitted).

But "a prison's simply failing to attend to the medical needs of its disabled prisoners" does not constitute a violation of the ADA. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (affirming a grant of summary judgment where a prisoner did not allege discrimination, disparate treatment, or exclusion from a prison service or activity based on his paraplegia). "The ADA does not create a remedy for medical malpractice." *Id.* Discrimination under the ADA can be established in one of three ways: (1) with intent on the basis of the disability, (2) by refusing to provide a reasonable accommodation, or (3) through a rule that disproportionately impacts disabled people. *See Washington v. Indiana High Sch. Athletic Ass'n*, 181 F.3d 840, 847 (7th Cir. 1999). Refusal to make a reasonable accommodation effectively denies a qualified individual with a disability access to a given service or program. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

3. <u>Count III against Rob Jeffreys, as Director of the IDOC</u>

Jeffreys argues that this claim should be dismissed for failure to state a claim because, although it is styled as an ADA/RA claim, in reality, it concerns the adequacy of Mr. Morris'

9

medical care and not that he was discriminated against or denied access to programs or services *because of* his alleged disability. Dkt. 54, 8-11. In response, the Estate argues that he was in segregation "because of his disability," despite having plead that he was "placed into segregation pending an investigation into pills that were found in his cell." Dkt. 57, 5; dkt. 42, ¶ 25. The Estate further argues that discovery will reveal that Mr. Morris' "disciplinary infractions resulted from his mental illness." Dkt. 57, 5. Although "a plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint," he risks pleading himself out of court if he "alleges facts that show he isn't entitled to a judgment." *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 79 (7th Cir. 1992); *see Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) (pleading oneself out of court, a concept that pre-dates *Twombly* and *Iqbal*, survives those decisions). Here, the Estate does not allege facts consistent with its SAC—in fact, its contention in response that Mr. Morris was in segregation *because of his disability* is wholly different than its SAC statement that his placement was a result of the disciplinary investigation. These allegations do not explain how Mr. Morris was discriminated against—rather, they allege that IDOC "failed to provide adequate treatment" and that he and other inmates "were not receiving minimally adequate mental health care while incarcerated in IDOC." Dkt. 42, ¶¶ 46, 48. The Estate even provides a non-discriminatory reason for the inadequate care: namely, that "there was not a sufficient mental health staff at Dixon." *Id.* at ¶ 49.

Jeffreys cites to two analogous cases from the Central District. In *Crandall*, an inmate with a known history of mental illness was placed in segregation for a disciplinary issue and committed suicide three days later. As part of the disciplinary investigation, prison staff threatened to keep him in segregation for one year and threatened violence against his mother.

10

He was treated with psychotropic medications, but not intensive psychological or psychiatric services. No medical professional had seen Crandall for 30 days before his death. On the day of his death, the warden spoke to Crandall and immediately instructed a clinical social worker from the medical staff to see him. She did not. And the prison employee whose job it was to perform 30-minute cell checks also neglected to check his cell for a period of 61 minutes, during which time, Crandall died by suicide. *Estate of Crandall v. Godinez*, No. 14-cv-1401, 2015 U.S. Dist. LEXIS 40950, at *3-5 (C.D. Ill. Mar. 30, 2015).

In *Crandall*, the court found that the estate failed to state a claim of discrimination or failure to accommodate under the ADA because Crandall was not denied access to medical services, the estate just alleged their inadequacy. *Id.* at *21 ("This claim—that Crandall was not properly treated for his mental illness—is distinctly different from a claim that Crandall was denied access to medical services, and is not cognizable under the ADA."). Like Mr. Morris, Crandall was in segregation for disciplinary reasons and received medication and some form of psychological treatment. But while Mr. Morris spoke with his psychologist on the day of his death (albeit to confess his suicidal thoughts and seek immediate treatment), Crandall did not speak to any of the medical staff on the day of his death (even though the Warden told the social worker to visit him). In that regard, Crandall's situation was even more dire than Mr. Morris', and yet these facts did not amount to a violation of the ADA.

On the other hand, at least according to one court, an inmate who alleged that she was placed in segregation because of her disability, not for disciplinary reasons, and denied access to medical treatment plausibly alleged a claim under the ADA. *See Andrews v. Rauner*, No. 3:18-cv-1101, 2018 U.S. Dist. LEXIS 131412, at *12-13 (C.D. Ill. Aug. 3, 2018) (denying motion to dismiss when inmate was subjected to solitary confinement because of her mental illness, not

11

because of discipline, with little or no clothing and denied access to medical services, including group therapy as punishment for self-harm). Similarly, in *Corbin*, the court denied a motion to dismiss brought by an inmate who was subjected to solitary confinement because of a disability, not for disciplinary reasons, and denied access to basic medical care that was provided to non-disabled inmates. *Corbin v. Indiana*, No. 3:16CV602-PPS/MGG, 2018 U.S. Dist. LEXIS 68271, at *11 (N.D. Ind. Apr. 23, 2018) (citing *Crandall* and calling the allegation of a non-discriminatory reason for being placed in segregation a "fatal flaw" to the complaint). Taking all allegations as true and drawing all reasonable inferences in favor of the plaintiff, the Estate fails to plausibly allege discrimination because of disability.

  Further, the Estate alleges Mr. Morris was a qualified individual with a disability because he suffered from a serious mental illness and otherwise met the essential eligibility requirements for participation in services and programs provided by IDOC. Dkt. 42, ¶¶ 82, 89. It alleges that IDOC "failed to reasonable [sic] accommodate" him specifically because it denied "access to human contact, rehabilitation opportunities, group therapy, and inpatient mental care." *Id.* at ¶ 91. Specifically, the Estate compares Mr. Morris' mental illness to other inmates' physical illnesses and injuries, alleging that IDOC made arrangements for those inmates to receive outside hospitalization and care but would not for Mr. Morris because his illness was mental. *Id.* at ¶¶ 92-93. It goes without saying that one suffering from a serious medical condition—physical or mental—should receive the appropriate treatment. However, IDOC's provisioning of "specialized medical services, such as dialysis and chemotherapy," is not an accommodation for their disabilities: it is a medical treatment. *Id.* at ¶ 54. The transferring to outside facilities is the actual accommodation. The Estate's claim is essentially that IDOC should have prescribed, as part of a treatment plan, an inpatient mental health stay or group therapy.

In its Response, the Estate relies on the First Circuit case of *Kiman v. New Hampshire Department of Corrections*, 451 F.3d 274 (1st Cir. 2006). In *Kiman*, an inmate with ALS sued the state department of corrections for denying him necessary medication prescribed by his doctor. The district court granted summary judgment on the ADA Title II claim in favor of the state department of corrections. On appeal, the First Circuit vacated the lower court's grant of summary judgment and remanded because the court "failed to address admissible record evidence that may suffice to create genuine issues of material fact" in regard to the ADA claim. *Id.* at 276. But the Estate's reliance on *Kiman* is misplaced, and not only because of the different procedural postures. Kiman was prescribed medication by his doctor to treat his ALS, and the prison denied him access to those medical services. But *Kiman* drew a critical distinction: "[u]nlike . . . decisions regarding the diagnosis and treatment of Kiman's ALS, the defendants' failure to give him access to his medications is not, on these facts, a medical judgment subject to differing opinion -- it is an outright denial of medical services." *Id.* at 287. The Estate analogizes *Kiman*, arguing that "Defendants refused to provide Mr. Morris with access to medical care— outside hospitalization." Dkt. 57, 5. But the key distinction is that Kiman was *prescribed* his medication and the prison's denial was a denial of access to his prescribed medical treatment. The Estate does not allege that Mr. Morris was denied access to any treatment or medication *that he was prescribed*. Thus, the Estate's claim is one based on a medical judgment subject to a differing opinion, which *Kiman* did not consider a violation of the ADA.

Further, the Estate argues that IDOC discriminated against Mr. Morris in the provisioning of medical services. The Estate specifically says that IDOC "did not arrange to have mentally ill patients like Mr. Morris transferred offsite *when they required outside hospitalization*." *Id.* at 7 (emphasis added). This raises the same distinction: whether outside hospitalization was required

13

is a medical judgment subject to differing opinion and not properly raised as a violation of Title II of the ADA.

Additionally, throughout the SAC, the Estate alleges denial of "reasonable accommodation." Dkt. 42, ¶¶ 88-96. But in its Response to Jeffreys' motion, it equates a failure-to-accommodate claim with a denial of access to services claim. Dkt. 57, 6. Regardless of the theory, neither is plausibly alleged here. Mr. Morris was seen and evaluated by a psychiatrist, psychologist, and behavioral health tech. The Estate alleges that neither the psychiatrist, nor the psychologist, nor the behavioral health tech ordered an inpatient stay as part of his mental health treatment—even after learning of his suicidal thoughts. Taking these allegations as true and construing all reasonable inferences in favor of the Estate, this is an argument based on disagreement with the medical staff's treatment decisions—not accommodation. The Estate pleaded the following allegations:

- Mr. Morris spoke with a behavioral health tech on September 12, 2018 at 2:15 PM and conveyed his emotional concerns, *id.* at ¶ 33;

- Mr. Morris requested to speak with his psychologist, and on September 12, 2018 at 7:10 PM, he told his psychologist that he was planning on killing himself, *id.* at ¶ 34; and

- Mr. Morris began shouting in his cell, which other inmates in his wing were able to hear and respond to by kicking their cell doors, *id.* at ¶¶ 37-38.

These allegations show that Mr. Morris was actively speaking to multiple healthcare providers in the twelve hours prior to his death, and that he was not so isolated that other inmates could not hear him. To require IDOC to have sent Mr. Morris for inpatient therapy or group therapy is asking Jeffreys' IDOC staff to second-guess the treatment plans of the attending doctors and medical experts. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018) ("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention."). The Estate argues that this was not

enough—that IDOC should have transferred Mr. Morris to an outside facility, like an inpatient mental health clinic. But a complaint about the adequacy of Mr. Morris' healthcare is not properly within Title II of the ADA. *See, e.g.*, *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). The only reasonable inference this Court can draw is that the Estate's allegations address inadequate medical treatment, not a failure to provide reasonable accommodation for said treatment programs or services. Thus, the Estate's pleadings fail to plausibly allege a claim under the ADA/RA.

The Court does not discount the tragic loss of life while Mr. Morris was in the custody of the state. Rather, the Court today finds that an ADA/RA claim against Jeffreys, as Director of IDOC, is not the proper vehicle for relief under these allegations. Therefore, Jeffreys' Motion to Dismiss is granted with respect to Count III.

For the reasons herein, Jeffreys' motion to dismiss [53] is granted, and Williamson's motion to dismiss [46] is denied. Counts I and III are dismissed with prejudice. *See Henderson v. Dekalb Cmty. Unit Sch. Dist. 428*, No. 3:20-cv-50124, 2021 U.S. Dist. LEXIS 122166, at *12 (N.D. Ill. June 30, 2021).

Date: July 28, 2021          By: _____
                                  IAIN D. JOHNSTON
                                  United States District Judge